## UNITED STATES BANKRUPTCY COURT
### FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JAMES GARABEDIAN**,                                    Chapter 7
    Debtor                           Case No. 11-13548-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEWART F. GROSSMAN,**
**CHAPTER 7 TRUSTEE**,
    Plaintiff
v.                                                      Adv. P. No. 12-1173
**JAMES GARABEDIAN**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Amended Complaint filed by Stewart F. Grossman, the Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of James Garabedian (the "Debtor"). Through his Amended Complaint, the Trustee seeks the denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3), (a)(4), and (a)(5). Specifically, the Trustee alleges that the Debtor's discharge should be denied because the Debtor has failed to explain satisfactorily the loss of approximately $300,000 in cash within two years of the commencement of his bankruptcy case; because the Debtor unjustifiably has failed to keep or preserve recorded information, including books and records, from which his financial condition or business transactions might be ascertained; and, finally, because the Debtor knowingly and fraudulently made false oaths in connection with his case. The

1

Debtor answered the Amended Complaint, denying the Trustee's allegations in support of his claims.

In accordance with the Court's pretrial order, the parties filed a Joint Pretrial Memorandum on September 17, 2013. The Court, after granting several requests for continuances, conducted a trial on September 16, 2014 at which three witnesses testified and 34 exhibits were admitted into evidence.

In accordance with Fed. R. Bankr. P. 7052, the Court now makes its findings of fact and rulings of law. The issue presented is whether the Trustee sustained his burden of proof under 11 U.S.C. § 727(a)(3), (a)(4), or (a)(5). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J) in which the Court is authorized to enter a final order.

## II. FACTS

### A. Procedural Background

The Debtor filed a voluntary Chapter 7 petition on April 19, 2011. At the time, he was represented by Attorney Stephen Mooney.[1] The Debtor filed Schedules, a Statement of Financial Affairs and other documents with his petition. On Schedule A-Real Property, he did not disclose an interest in property, although he was a signatory to a Mortgage, dated March 24, 2006, which secured an obligation in the sum of $456,000, originally granted to Interstate Mortgage Network, and encumbering the Debtor's family's residence

---

[1] Attorney Mooney moved to withdraw as Debtor's counsel on July 22, 2011. Attorney Richard A. Cutter  filed a Notice of Appearance as Successor Counsel to the Debtor the same day. It would appear from the Motion to Withdraw and the Notice of Appearance that the Debtor was represented by counsel throughout his Chapter 7 case.

located at 16 Old Colony Drive, Wakefield, Massachusetts. On Schedule B-Personal

Property, the Debtor disclosed, among other things, a promissory note from a former

business partner, Paul Maginzini, in the amount of $25,000, and a 2005 Mercedes E-500

with a value of $18,000.[2]  He did not list any stock or interests in incorporated and

unincorporated businesses, or any interests in partnerships or joint ventures. On Schedule

F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed 33 creditors.  Of

those creditors, the Debtor listed approximately one-half with claims in an "unknown"

amount.  The Debtor disclosed total monthly income of $5,045.84.  He listed his income as

$2,522.92 and his "Spouse's Monthly Income" of $2,522.92 in the same  column in which

he was obligated to list his income, representing that they were both employed by Financial

Business Brokers.  He listed monthly expenses in the amount of $6,795.04.

The Trustee conducted six section 341(a) meetings, and the Debtor amended his

---

[2] The Court may take judicial notice of its docket. *See* <u>In re Mailman Steam
Carpet Cleaning Corp.</u>, 196 F.3d 1, 8 (1st Cir.1999) ("The bankruptcy court appropriately
took judicial notice of its own docket.").

Mercedes-Benz Financial Services USA LLC filed a motion for relief from stay
with respect to a 2005 Mercedes-Benz E500W4, jointly owned by the Debtor and his
spouse and purchased on June 9, 2008, ascribing a value to it of $16,175.  JPMorgan
Chase Bank filed a motion for relief from stay to which it attached a Retail Installment
Contract with the Debtor's signature, with respect to a 2006 Mercedes ML500, which the
Debtor (and his spouse) allegedly purchased on November 30, 2006, ascribing a value to
it of $18,000. The Debtor denied ownership of the vehicle as title was in his wife's name
and asserted his signature was not genuine. Nevertheless, at a hearing held on
November 22, 2011, the Court ordered the Debtor to cure all arrears within 30 days and
authorized JPMorgan Chase Bank to file an affidavit of noncompliance in the event of
further defaults.  JPMorgan Chase Bank filed an affidavit of non-compliance with the
Court's order and the Debtor filed an opposition.  Nevertheless, on March 4, 2013, the
Debtor withdrew his opposition and the Court granted the Motion.  On Schedule D, the
Debtor listed "Chase" as a creditor.

Statement of Financial Affairs several times.  The Debtor's Statements of Financial Affairs

will be discussed more fully below.  The Trustee, after obtaining several extensions of the

deadline imposed by Fed. R. Bankr. P. 4004(b), timely filed a complaint against the Debtor

seeking the denial of his discharge on July 10, 2012.

B. <u>Facts Adduced at Trial</u>

At trial, the Trustee and Paul M. Giannelli ("Giannelli") testified.  In addition, the

Debtor was called to testify by the Trustee and also testified on his own behalf.

Giannelli testified that he first met the Debtor in the summer of 2008 when the

Debtor approached him with respect to a lease of property located at 637-639 Broadway,

Malden, Massachusetts.  Giannelli, in his capacity as co-trustee of Capital Realty Trust,

entered into a five-year lease agreement with Gara Foods, Inc. ("Gara Foods"), a

Massachusetts corporation wholly owned by the Debtor.  The Debtor, through Gara Foods,

intended to and did operate a roast beef restaurant known as Jimbo's Place at that location.

Specifically, Gara Foods was a corporation organized by the Debtor in October 2008 to,

among other things, "engage in, own, lease, rent, equip, construct, conduct, operate and

maintain one or more restaurants, both take out and sit down." The Debtor was the

president, treasurer, secretary and sole director.  Giannelli testified that he contributed

virtually all the funds for the build-out of the restaurant while the Debtor contributed

approximately $10,000.

Giannelli testified that he made personal loans to the Debtor, including a $65,000

loan on July 23, 2008.  In addition, he purchased a note, dated June 19, 2008, executed by

4

an individual identified as Skender Kraja ("Kraja"), made payable to the Debtor and John Spencer ("Spencer") in the original principal amount of $80,000. According to Giannelli, the Debtor asked him to purchase the note because Spencer needed money for his daughter's wedding. The note was payable in full within 36 months with interest upon the unpaid balance at the rate of 6% per annum. In addition, the note was payable in 36 consecutive monthly installments in the amount of $2,433.75, commencing on July 15, 2008. Giannelli purchased the note, which was related to the sale of Ken's New York Deli in Haverhill, Massachusetts, for the sum of $55,000. The Debtor and Spencer executed an Assignment of the note to Giannelli on August 7, 2008. In addition, on the same date, the Debtor, Spencer and Giannelli sent Kraja an Amendment to Promissory Note in which they notified him of the assignment and set forth September 1, 2008 as the date of the first monthly payment. Kraja filed a voluntary bankruptcy petition in May of 2010 and successfully avoided a prejudgment attachment on his condominium obtained by Giannelli.

On October 15, 2008, Giannelli Management & Development Corporation gave Giannelli a check in the sum of $50,000 in payment of interest and fees owed by the corporation to him. Giannelli testified that the check was given to him by a bookkeeper and it was on his desk when the Debtor came into his office. Giannelli stated:

> It was just laying there and the bookkeeper had laid it down and ironically he [the Debtor] asked for a favor. He wanted me to give him a check for $50,000. In return, he would give me his check for $50,000 post-dated for 30 days. He needed his - - his accountant wanted him to show some income he told me. So I gave him the check. He gave his and with his, I could never cash

5

it.

Giannelli endorsed the Giannelli Management & Development Corporation check to the Debtor. The Debtor then endorsed and cashed the check. In addition, the Debtor, on October 15, 2008, gave Giannelli a personal check post-dated November 25, 2008, in the sum of $50,000. Giannelli, however, was never able to cash the check.

On October 21, 2008, to document the $50,000 debt owed to him, Giannelli prepared a Demand Note in the principal sum of $125,000. The Debtor executed the note, promising to pay Giannelli the sum of $125,000, plus interest at the rate of 9%. The Debtor never paid any portion of the sums due under the note, although he repeatedly promised to do so. According to Giannelli, following the sale of a restaurant in which he had an interest, the Debtor called him from the closing, promising to send $125,000 directly to his bank, Salem Five, located at the Square One Mall in Saugus, Massachusetts. The Debtor did not fulfill that promise. Later, he represented to Giannelli that the closing was delayed.

Despite the Debtor's failure to repay him the monies he had loaned him, Giannelli made a further loan to the Debtor in the sum of $20,000 when the Debtor begged him to loan him money to save his home from foreclosure, indicating that absent a loan he would be compelled to borrow money from a "loan shark." In addition, in January of 2009, Giannelli loaned the Debtor $10,000 based upon the Debtor's representation that he had insufficient funds in his bank account at Salem Five to cover a check payable to the Town of Saugus in the sum of $5,000 to renew a liquor license for a restaurant Giannelli identified

6

as the Iron Horse Restaurant [sic] as well as other expenses.[3]

Because of the Debtor's numerous defaults and failure to pay personal loans, as well as unpaid construction costs associated with the restaurant, Giannelli advised the Debtor in December of 2008 that he would have to "take Gara Foods and put it in . . . [his] . . . name for security." Giannelli admitted becoming owner of the corporation on December 31, 2008 when the Debtor transferred the shares of the corporation to him for $1.00.[4]   He stated:

> I transferred everything out of his name on Gara Foods except I left him president and I told him that, you know, once the stuff -- once the loans are paid, come in, take your company. I don't want it. You can have it and I would give it back to him. So that's why I left him on as president. Unfortunately, I forgot to take his name off the [bank account] signature card.

According to Giannelli, the Debtor made an unauthorized withdrawal of $6,000 from Gara Foods's bank account.  In addition, the Debtor used an American Express credit card Giannelli obtained for Gara Foods for expenses unrelated to Gara Foods, Inc., expending approximately $15,000.  Giannelli testified that credit cards were obtained in February of 2009 and canceled in March of 2009.  Nevertheless, Giannelli eventually sold Gara Foods

---

[3] The Debtor disclosed on his Statement of Financial Affairs filed on October 18, 2011 that he had an interest in Iron Works Grille & Tavern, Inc. He further disclosed that his interest terminated on November 30, 2007 and that the business ceased operating on March 18, 2008. In a Certificate of Vote attached to the Debtor's Exhibit 6, the directors of Iron Works Grille & Tavern, Inc. voted to authorize the Debtor to sell his 50% interest in the corporation to Paul Maginzini.  In addition, the Debtor resigned his positions as treasurer, secretary and director of that corporation effective November 30, 2007.

[4] The Debtor executed a Bill of Sale on December 31, 2008, which purported to transfer Gara Foods to Giannelli for $100 and "100% Capitalization of Gara Foods, Inc."

7

for approximately $135,000 in June of 2010, although he vehemently denied recouping his investment.

On July 16, 2009, Giannelli sent the Debtor, by certified mail, a letter referenced "Enforcement, Demand Note and NSF Check." In the letter, Giannelli demanded repayment of $125,000 pursuant to the Demand Note and repayment of $50,000 arising out of the post-dated check. The Debtor did not respond to the letter by making any payments.

Giannelli insisted that he lost a considerable amount of money because the Debtor did not pay him for construction costs associated with Jimbo's Place in Malden owned by Gara Foods. He explained that he paid contractors directly to avoid statutory liens, adding that the Debtor was in breach of the lease. Giannelli testified that the restaurant opened in February of 2009 and that he expended approximately $295,000 in the build-out of the restaurant. He insisted that he was not the Debtor's partner in the restaurant, explaining that, after December 1, 2008, after he took control over Gara Foods, he also had control over the books of Gara Foods and paid contractors, employees, and business expenses, including food, from his personal account or that of Giannelli Management & Development Corporation because Gara Foods had no money. He added that the Debtor did little work for the restaurant and that the restaurant did not make money.

During his testimony, the Debtor admitted owing Giannelli $65,000 as of September 23, 2008; $50,000 as of October 15,, 2008; $10,000 as of January 15, 2009; and $20,000 as of March 10, 2009 for the loans made to him. The Debtor also testified about his experience in the restaurant business, indicating that, at the time of trial, he was a co-manager of

8

Blackbeard Enterprises, LLC and the owner of a 50% interest in that limited liability company.  Prior to his involvement with Blackbeard Enterprises, LLC which began in December of 2013, the Debtor was involved in the start-up of a New York-style deli in Salem, Massachusetts which failed.  The Debtor testified that in the past ten years he has owned or managed a number of roast beef and seafood sandwich shops or New York-style delis.  He also indicated that in 2008 and 2009, his financial condition was dire, that his home was in foreclosure and that his automobile was being repossessed.  He stated:  "we had no money to pay our bills."  He explained that "[o]ur household bills were $100,000 a year.  We were over-extended between car payments, college tuition, big mortgage."  He stated that the monthly bills were $9,000, that he was unable to keep up because he was failing, and that "[e]very business that I tried to do, I - -  it was 2008, 2009,  it was the worst - - worst time of the recession."  He added that he was "playing catch-up," adding "I would get caught up but then fall behind."  Although the Debtor indicated that his household bills were $9,000 per month, his Schedule J did not support that level of expense.  At least as of the date of the filing of his bankruptcy petition in April of 2011, he represented that his household expenses were approximately $7,000 per month, not $9,000 per month.   In addition, the Debtor did not disclose any business expenses on Schedule J.  As noted below, on Schedule B and his original Statement of Financial Affairs, the Debtor did not disclose any interests in corporations, unincorporated businesses, limited liability companies, or partnerships in the six years prior to the date of the filing of his bankruptcy petition.  Accordingly, the Debtor did not clearly set forth in either his testimony or his Schedules

9

how much money he was paying business creditors and business lenders and how much

he contributed to household expenses.

The Debtor admitted that he signed his Statement of Financial Affairs under penalty

of perjury and that he amended his Statement of Financial Affairs twice.  The Debtor's

responses to Question 1 on the Statement of Financial Affairs regarding income from

employment or operation of a business is summarized as follows:

| SOFA filed 4/19/2011 Amount | SOFA filed 4/19/2011 Source | SOFA filed 9/19/2011 Amount | SOFA filed 9/19/2011 Source | SOFA filed 10/18/2011 Amount | SOFA filed 10/18/2011 Source |
|---|---|---|---|---|---|
| $11,190.00 | 2011 YTD: both Business Income | $11,190.00 | 2011 YTD: both Business Income | $11,190.00 | 2011 YTD: both Business Income |
| $60,500.00 | 2010: both Business Income | $60,500.00 | 2010: both Business Income | $23,839.00 | 2010: both Business Income |
| $16,103.00 | 2009: both Business Income | $16,103.00 | 2009: both Business Income | $16,130.00 | 2009: both Business Income |

On his 2008 Joint Income Tax Return, the Debtor and his spouse, Diane Garabedian,

reported adjusted gross income of $59,097.  On that return, he reported receipt of $40,000

from the sale of Buffalo Bills Seafood LLC and $57,500 from the sale of Forest Hills

Beverage LLC, setting forth no gain or loss with respect to the former and a gain of $57,500

with respect to the latter.  On his 2009 Joint Income Tax Return, the Debtor and his spouse

reported adjusted gross income of $16,103, including net profit of $13,484 from the

operation of a business, namely B & J Business Brokers.  In 2010, the Debtor and his spouse

reported $22,166 in adjusted gross income, including a net profit of $16,262 from the

10

operation of B & J Business Brokers. In an affidavit executed by the Debtor under penalty

of perjury on October 7, 2011, which he submitted into evidence as part of his Exhibit 10,

the Debtor represented that he did not file any tax returns for Ken's New York Deli, Inc.,

John QA Enterprises, LLC, Buffalo Bills Beef & Seafood LLC and Forest Hills Beverage,

LLC for calendar years 2008, 2009 and 2010, ostensibly because those entities did not

produce any profits when he had an ownership interest in them.  In addition, he stated that

he did not have tax returns for Gara Foods, Inc. for 2008, 2009, and 2010 because Giannelli,

as "co-owner" had the returns in his possession.

     In addition to the information provided by the Debtor about his income, the Debtor

denied that he had an accountant who kept or supervised the keeping of books of account

and records. The Debtor and his spouse, however, used the "Konstadinos Koutroubis E.A.,

Dino's Tax Prep" to prepare their tax returns.   In addition, the Debtor provided

inconsistent answers to Question 18 on the Statement of Financial Affairs, which requires

a response to the following:

> If the debtor is an individual, list the names, addresses,
> taxpayer-identification numbers, nature of the businesses, and beginning and
> ending dates of all businesses in which the debtor was an officer, director,
> partner, or managing executive of a corporation, partner in a partnership,
> sole proprietor, or was self-employed in a trade, profession, or other activity
> either full- or part-time within six years immediately preceding the
> commencement of this case, or in which the debtor owned 5 percent or more
> of the voting or equity securities within six years immediately preceding the
> commencement of this case.

On his original Statement of Financial Affairs, the Debtor responded "None" to Question

18.  In his first Amended Statement of Financial Affairs, the Debtor provided the following

11

information:

| | | |
|---|---|---|
| Gara Foods, Inc.(000987963)<br>637 Broadway, Malden, MA 02148 | Restaurant | 10/10/08-12/31/08 |
| Ken's NY Deli, Inc. (000992033)<br>1 Hilltop Rd., Lynnfield , MA 01940 | Restaurant | 1/1/09-1/1/09 [sic] |
| Jimbo's Famous Roast Beef<br>& Seafood, Inc. (3967)<br>297 Lincoln Ave., Haverhill, MA | Restaurant | 4/7/05-6/20/06 |
| John QA Enterprises, LLC (000970440)<br>111 Washington St., Quincy, MA<br>02169 | Restaurant | 2/4/08-5/2008 [sic] |
| Buffalo Bills Beef & Seafood, LLC<br> (870778413)<br>825 Main St., Reading, MA 01867 | Restaurant | 11/28/06-8/2008 |
| B & J Business Brokers (3967)<br>16 Old Colony Dr., Wakefield,<br>MA 01880 | Business broker/<br>restaurant consultant | 1/2009 (presently<br>operating) |
| Forest Hills Beverage, LLC<br> (263030787) 1185 Main St.,<br>Haverhill, MA 01830 | Restaurant | 5/12/08-8/1/08 |

Although the Debtor reported on September 19, 2011 that B & J Business Brokers operated

from January 2009 to the present, he listed Financial Business Brokers as his employer on

Schedule I.  In his Second Amended Statement of Financial Affairs, filed on October 18,

2011, the Debtor added the following entity:

| | | |
|---|---|---|
| Iron Works Grille & Tavern, Inc.<br>(000833955) aka Saugus/Dockside, Inc.<br>1201 Broadway, Saugus, MA 01906 | Restaurant | Beginning/ending of<br>debtor's interest: 6/27/07-<br>11/30/07<br>Beginning/ending of the oper. of<br>the business: 1/21/03-3/18/08 |

As noted, the Debtor filed an Amended Statement of Financial Affairs on September

19, 2011.  The submission followed the filing by the Trustee of a Motion to Enlarge Time within which to Object to Discharge on July 25, 2011 and the Debtor's employment of successor counsel.  The Debtor represented in his Motion to Amend Statement of Financial Affairs that the information about his business interests was "inadvertently omitted."

The Debtor testified about a former business partner named Iraki Quirjazi, known as "Hercules."  The Debtor admitted that he received $31,000 in the form of a Sovereign Bank check, dated June 4, 2008.  He testified that he received that sum of money as a loan from Hercules and paid bills with the money received.  On January 15, 2009, he executed a document which provided the following:

> "I, James Garabedian, 16 Old Colony Drive, Wakefield, MA, for a good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agree that I am personally responsible for $65,000 plus all applicable interest, fees and costs connected therewith on a certain loan made to MTD, Inc. by Sovereign Bank personally guaranteed byIraki Quirjazi . . . (Loan #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-6) dated June 4th, 2008. I hereby further agree that I shall at a minimum make the monthly interest payments on said loan. I hereby agree further that I along with Iraki Quirjazi I [sic] am jointly and severely responsible to pay a [sic] to Cara Donna and any other liabilities outstanding in connection with MTD Inc., John QA Enterprises, LLC, Rocco's Famous  Roast Beef & Seafood.

The Debtor testified that he did not have an interest in MTD, Inc.  He stated that he guaranteed its obligation to Sovereign Bank "[b]ecause  John QA Enterprises failed and Hercules lost money there, so he gave me the $31,000 in monies and we lost other money in that entity and that's why I signed the $65,000 being responsible." In responses to the Trustee's Request for Admissions, however, the Debtor denied receiving $31,000 from Sovereign Bank on June 4, 2008.  Although his response to that request for admission was

13

executed under penalty of perjury, the Debtor insisted his response must have been a

mistake, stating he received money from Hercules and owed money to Hercules, despite

the language in the document reproduced above and the receipt of a check from Sovereign

Bank and the existence of numerous checks made payable to Sovereign Bank, for example,

check no. 184, dated October 21, 2008 in the sum of $450, and check no. 226, dated January

1, 2009 in the sum of $500, as well as checks made payable to Cara Donna, an unidentified

individual or entity.  The Debtor did not list either Sovereign Bank nor Iraki Quirjazi on

Schedule F.

The Debtor testified that he held a 50% membership interest in Forest Hills

Beverage, LLC ("Forest Hills").  He stated that his role in the restaurant venture involved

construction and the installation of furniture and equipment.  The business was sold to

Kraja in June of 2008 before the build-out of the restaurant; that Forest Hills received a

down payment of $60,000 and he and Spencer each received $30,000 in cash.  The Debtor

also indicated that the project "ran into overruns" and that the $80,000 note from Kraja was

sold to Giannelli for $55,000.

The Debtor also testified that he had a 50% membership interest in, and was a co-

owner of, Buffalo Bills Beef & Seafood, LLC, despite the percentage interest set forth in the

Indemnification Agreement reproduced below.  The Debtor sold his interest in that entity

and, on August 11, 2008, he executed an Indemnification Agreement which provided in

relevant part the following:

Whereas, on August 18, 2008, a Bill of Sale was executed whereby JAMES

14

GARABEDIAN (hereinafter referred to as SELLER) sold to MICHAEL A.
CASOLI (hereinafter referred to as BUYER) his Twenty-Four and 9/10
(24.9%) percent interest in the limited liability company known as BUFFALO
BILLS BEEF & SEAFOOD, LLC for the sum of Forty Thousand and No/100
($40,000.00) Dollars; and

Whereas, said Twenty-Four and 9/10  (24.9%) percent interest which has
been sold by JAMES GARABEDIAN to MICHAEL A. CASOLI, constitutes
JAMES GARABEDIAN'S one hundred (100%) percent interest in said limited
liability company known as  BUFFALO BILLS BEEF & SEAFOOD, INC. [sic]

Now, therefore, in consideration of this duly executed Indemnification
Agreement, and in consideration of other covenants herein contained, and
other good and valuable consideration, the undersigned MICHAEL A.
CASOLI and BUFFALO BILLS BEEF & SEAFOOD, LLC do hereby and
herewith remise, release, indemnify, and forever discharge JAMES
GARABEDIAN from any and all debts, demands[,] actions[,] causes of
action, suits, accounts, covenants, contracts, agreements, damages, and any
and all claims, demands and liabilities whatsoever of every name and nature,
both in LAW and in EQUITY, which anybody may have against the said
JAMES GARABEDIAN, from the beginning of the world to this date and
more especially on account of any and all matters arising out of all claims
and counterclaims, relative to the business BUFFALO BILLS BEEF &
SEAFOOD, LLC  . . . .

The Debtor testified that Michael A. Casoli ("Casoli") returned his $40,000 investment to

him.  He further indicated that he may have paid some bills with that money or put some

money back into Forest Hills.  The Debtor admitted that he kept no records in connection

with how the $40,000 was spent.  He stated that he had no written contracts, no written

changes orders, no invoices, and had few receipts with respect to the Forest Hills build-out.

In 2009, the Debtor borrowed money from Apostolos Viglas ("Viglas").  He testified

that he needed a personal loan at the time.  On August 14, 2009, the Debtor testified that

he received an Eastern Bank check from Helen Viglas, Viglas's spouse, in the sum of

$16,000.  On the same date, he executed a promissory note in favor of Viglas in the sum of

$16,000, payable by October 1, 2009 with no interest.  He testified that he used the money

to pay bills, admitting that his Salem Five account was closed on July 20, 2009 for

overdrafts.  He added that he gave his wife the $16,000 to pay household bills.  Around that

time, his wife deposited $11,000 into her account ostensibly to settle a lawsuit.

The Debtor testified that he had a single bank account at Salem Five.  He did not

dispute the contents of the Trustee's Chalk, which set forth receipt of $295,250 from various

sources between June 4, 2008 and August 14, 2009, including loans from Giannelli and

Viglas, the receipt of $40,000 from Casoli and the $31,000 check from Sovereign Bank.  He

also admitted that he failed to keep records that would establish that his monthly expenses

were $9,000.  He failed to coherently articulate what bills he paid with the monies he

received, as well as the monies he deposited and withdrew from his Salem Five account

in  over the counter transactions.  Although the Debtor in responses to the Trustee's

Requests for Admissions, denied or improperly qualified his answers to the Trustee's

Requests, the Trustee through the Debtor's admissions at trial established that the Debtor

received $295,250 between June 4, 2008 and August 14, 2009; that he deposited  $137,500

from the $295,250 received into his Salem Five Account; and that he withdrew at least

$89,100 from the account.

Although the Debtor reported modest income in his Statement of Financial Affairs

and to the Department of the Treasury on his joint tax returns, the Debtor's bank account

at Salem Five showed total deposits from all sources of approximately $188,000 between

16

June of 2008 and July of 2010.  In addition, considering Giannelli's loans, other loans, and

proceeds from the sale of Forest Hills, the Debtor, as noted above, obtained $295,250.

Although the Debtor asserted that he made $70,104 in mortgage payments, relying upon

Debtor's Exhibit 21, the Mortgage contract executed in favor of Interstate Mortgage

Network, and Schedule J-Current Expenses of Individual Debtor(s), neither exhibit

establishes payments in that amount.  Furthermore, the Debtor's spouse testified at her

deposition that she could not recall the Debtor making mortgage payments in 2008 and

2009, and that the mortgage was not paid in 2010.[5]  She added that threats of mortgage

foreclosure were frequent and the mortgage loan was modified twice.

The Trustee testified that he conducted six meetings of creditors and requested all

of the Debtor's personal, family, and business records.  He stated that he received the

Debtor's joint income tax returns for 2008, 2009 and 2010 but was unable to ascertain with

any certainty what the Debtor's income and expenses were for those years.  The Trustee

explained that he attempted to investigate the Debtor's finances as a result of stories told

to him by creditors who had loaned money to the Debtor to open restaurants.  The Trustee

was concerned about the Debtor's inability to explain what happened to all the money that

was advanced to him.  While the Trustee acknowledged that the Debtor produced

approximately $30,413.01 in canceled checks for the period between June 5, 2008 and June

19, 2009, according to the Trustee, he did not adequately account for the remaining

---

[5] The Debtor introduced the deposition transcript of his spouse into evidence as
Debtor's Exhibit 1.

$265,000 received.  In addition, the Trustee testified that he never received adequate

information or documentation relative to the Debtor's purchase of multiple vehicles.

Following the Trustee's testimony, the Debtor was recalled to the witness stand.  The

Debtor introduced his spouse's bank records and introduced a chalk showing cash deposits

into her account totaling $88,810.  An examination of those records reveals, however, that

she wrote checks payable to the Debtor in the total sum of $2,500 in August and October

of 2008, thus reducing the total amount advanced to her by the Debtor.  In addition, the

Debtor relied on the existence of bank treasurer's checks in the sum of $30,413.01 and

checks totaling $103,450.05 from his Salem Five bank account between January 1, 2008 and

July 2009 to explain transactions in the total sum of $292,147.06.  The Debtor  did not

specifically identify particular checks used to pay bills and, thus, it is impossible to

ascertain  whether those checks, totaling $103,450.50, were used for business or personal

expenses and whether the Debtor was using his personal funds to pay obligations of

corporations or limited liability companies in which he had interests.  The Trustee,

however, established that the Debtor withdrew $89,100 from his account in the form of

checks payable to himself or over the counter withdrawals.  The Debtor could not provide

a credible explanation relative to the Trustee's chart (Trustee's Exhibit 37) showing receipts

of $295,250, deposits into the Salem Five account of $137,000 (the Court notes that it

calculated deposits of $187,952.79) and significant cash withdrawals from Salem Five and

checks totaling $89,100. The Debtor stated that he mixed payment of personal and business

bills and "it was all very confusing."

18

## III. DISCUSSION

A. <u>Applicable Law</u>

    1. § 727(a)(4)(A)

In <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106 (1st Cir.1987), the First Circuit stated:

Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, <u>In re Shebel</u>, 54 B.R. 199, 202 (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." <u>Matter of Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974).

The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." <u>Bank of Marin v. England</u>, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. <u>Matter of Vickers</u>, 577 F.2d 683, 687 (10th Cir. 1978); <u>In re Leichter</u>, 197 F.2d 955, 959 (3d Cir.1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); <u>Roberts v. W.P. Ford & Son, Inc.</u>, 169 F.2d 151, 152 (4th Cir. 1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." <u>Dilworth v. Boothe</u>, 69 F.2d 621, 624 (5th Cir. 1934).

On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. *The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.* As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." <u>Mascolo</u>, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See* <u>In re Tabibian</u>, 289 F.2d 793, 797 (2d Cir.1961); <u>In re Shebel</u>, 54 B.R. at 202. The bankruptcy judge must be deft and

evenhanded in calibrating these scales.

In re Tully, 818 F.2d at 110 (emphasis supplied). *See also* The Cadle Co. v. Duncan (In re

Duncan), 562 F.3d 688, 696 (5th Cir.2009) (citing Tully and shifting the burden to the debtor

to present evidence that he is innocent of the offense charged if the plaintiff establishes a

prima facie case.).[6]

---

[6] In Duncan, the Fifth Circuit fashioned a five part test in contrast to the First
Circuit's two part test. It stated:

> Section 727(a)(4) conditions the debtor's discharge on his truthfulness:
> "The court shall grant the debtor a discharge, unless . . . the debtor
> knowingly and fraudulently, in or in connection with the case ... made a
> false oath or account." To prevail on a claim under this subsection, an
> objecting plaintiff (a creditor or the trustee) must prove by a
> preponderance of the evidence "that (1) the debtor made a . . . statement
> under oath; (2) the statement was false; (3) the debtor knew the statement
> was false; (4) the debtor made the statement with fraudulent intent; and
> (5) the statement was material to the bankruptcy case." Sholdra v.
> Chilmark Fin. LLP (In re Sholdra), 249 F.3d 380, 382 (5th Cir. 2001) (citing
> Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir.
> 1992)). Circumstantial evidence may be used to prove fraudulent intent,
> id., and the cumulative effect of false statements may, when taken
> together, evidence a reckless disregard for the truth sufficient to support a
> finding of fraudulent intent, *see* id. at 383.
>
> False statements in the debtor's schedules or false statements by the
> debtor during the proceedings are sufficient to justify denial of discharge.
> Beaubouef, 966 F.2d at 178. Further, the materiality of an omission is not
> solely based on the value of the item omitted or whether it was
> detrimental to creditors. Id. Rather, the statement need only "bear [ ] a
> relationship to the bankrupt's business transactions or estate, or concern[ ]
> the discovery of assets, business dealings, or the existence and disposition
> of his property." Id. (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d
> 616, 617 (11th Cir.1984)). Indeed,
>
> > [t]he recalcitrant debtor may not escape a section
> > 727(a)(4)(A) denial of discharge by asserting that the

2. Analysis

The Court concludes that the Trustee submitted sufficient evidence to establish that the Debtor made a materially false statement in his Statement of Financial Affairs and that he failed to rebut that evidence. By answering "None" to Question 18, when the Debtor had interests in nine entities within the period set forth in that question, the Debtor made a materially false statement. The Court infers fraudulent intent from the Debtor's omission. Although the Debtor represented in his Motion to Amend Statement of Financial Affairs that his omission was inadvertent, the Court rejects that contention as the Debtor's tax returns for 2009 and 2010 also omit reference to any of the entities in which the Debtor had an interest. Because the Debtor received substantial monies in the form of loans or other payments, totaling $295,250, with respect to entities which the Debtor did not fully disclose until six months after the filing of his petition, the Debtor's omission, when juxtaposed against his Schedules I and J was seriously misleading.

Courts within the First Circuit have emphasized the requirement that debtors produce complete, truthful, and reliable information at the outset of bankruptcy proceedings. *See* <u>In re Tully</u>, 818 F.2d at 110. The purposes of the requirement is

---

admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.

<u>In re Duncan</u>, 562 F.3d at 695 (quoting <u>Chalik</u>, 748 F.2d at 618).

21

straightforward and logical.  The Trustee and creditors are entitled to make decisions based on fact rather than fiction.  Id.  The Court's conclusion that the Debtor made a materially false statement by answering "None" to Question 18 is not based on the value of the business entities he subsequently disclosed, which he testified failed.  Rather, the omission is material because the Debtor effectively concealed the totality of his business dealings at the commencement of his case, thus hampering the Trustee's discovery of potential assets, the existence and disposition of property of the estate, and, most importantly the discovery and recovery of potentially avoidable preferential or fraudulent transfers for the benefit of the estate.  See The Cadle Co. v. Duncan (In re Duncan), 562 F.3d 688, 695 (5th Cir.2009); Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir.1984). The Debtor's false statement not only hampered the Trustee but caused needless expenditures of time and money as the Trustee was compelled to conduct six § 341(a) meetings in an attempt to obtain pertinent information about the Debtor's financial affairs.  The Debtor's position that the business entities in which he had interests were worthless is specious as the Trustee was entitled to assess their value for himself based upon full disclosure of the Debtor's assets, liabilities, income and expenses, and prior business associations.  Accordingly, the Court shall enter a judgment on Count  III of the Trustee's Amended Complaint denying the Debtor a discharge.

3. § 727(a)(3)

Section 727(a)(3) provides that the court shall grant a discharge unless, "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

information, including books, documents, records and papers, from which the debtor's

financial condition or business transactions might be ascertained, unless such act or failure

to act was justified under all of the circumstances of the case." Harrington v. Simmons (In

re Simmons), 513 B.R. 161, 168(Bankr. D. Mass. 2014) (citing Peterson v. Scott (In re Scott),

172 F.3d 959, 969 (7th Cir.1999)).  The court in Simmons observed that "[t]he purpose of §

723(a)(3) of the Bankruptcy Code, and its predecessor, § 14(c)(2) of the Bankruptcy Act, is

to ensure that dependable information is supplied to the Trustee and to creditors on which

they can rely in tracing the Debtor's financial history." Id. at 169.  The court added:  "[t]he

Trustee and creditors are entitled to complete and accurate information showing what

property has passed through the Debtor's hands during the period prior to his

bankruptcy."  Id.

In Razzaboni v. Schifano (In re Schifano), 378 F.3d 60 (1st Cir. 2004), the First Circuit

articulated the standards for denial of discharge under 11 U.S.C. § 727(a)(3). It stated:

> Although this court has not yet squarely addressed the issue raised in §
> 727(a)(3), our sister circuits have described the standards for disclosure of
> records under the Act.
>
> > It is a question in each instance of reasonableness in the
> > particular circumstances. Complete disclosure is in every case
> > a condition precedent to the granting of discharge, and if such
> > a disclosure is not possible without the keeping of books or
> > records, then the absence of such amounts to that failure to
> > which the act applies.

> Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992) (citing In re
> Underhill, 82 F.2d 258, 259–260 (2d Cir.), cert. denied, 299 U.S. 546, 57 S.Ct. 9,
> 81 L.Ed. 402 (1936)). Therefore, "[w]hile a debtor may justify his failure to
> keep records in some cases, a discharge may be granted only if the debtor

presents an accurate and complete account of his financial affairs." <u>Alten</u>, 958 F.2d at 1230.

<u>In re Schifano</u>, 378 F.3d at 68.

 4. Analysis

The Court concludes that the Trustee is entitled to judgment on Count II of his Amended Complaint as the Debtor failed to keep or preserve sufficient records and papers from which his financial condition or business transactions might be ascertained. His failure to keep meaningful records of monies owed to him and by him, and his seemingly random payment of "bills" was not justified under all of the circumstances of the case.

The Debtor's bank account contained a hodgepodge of checks and over the counter withdrawals for the purpose of paying business and household bills. While it is apparent from the Trustee's evidence and the Debtor's testimony that he "robbed Peter to pay Paul," the Debtor, as an experienced restaurant broker and businessman, was obligated for both bankruptcy and tax purposes to keep records of his loans, his loan payments and the bills he paid. He utterly failed to keep a modicum of records from which his financial condition could be ascertained. Not only did he fail in most instances to identify the purpose of payments on the memo line of his checks, he was not able to set forth on Schedule F the amounts he owed many creditors. Indeed, the Court is not sanguine that he listed *all* his creditors.

The Debtor is not an unsophisticated businessman. He operated through corporations and limited liability companies. He assigned notes and executed an

24

indemnification agreement. He produced no evidence that he was incapable of maintaining sufficient books and records from which his financial affairs could be understood. The Debtor, like so many persons during the recent recession, suffered financial setbacks. The denial of his discharge is not because of his losses, but because he failed to adequately document his income, expenses, and transfers in a manner sufficient to enable to the Trustee to ascertain whether he was secreting monies or using personal funds to pay the obligations of corporations or limited liability companies in which he had an interest, on the one hand, or whether he paid bills and suffered losses on the other hand. Due to the dearth of records, the Trustee was unable to determine whether the debtor made preferential or fraudulent transfers which would be voidable and recoverable for the benefit of the estate. *See* 11 U.S.C. §§ 544, 547, 548, and 550.

5. § 727(a)(5)

Section 727(a)(5) provides that "the court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). In Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803 (B.A.P. 1st Cir. 2005), the panel stated:

> Section 727(a)(5) is broadly drawn and gives the bankruptcy court broad power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets. *See* D'Agnese, 86 F.3d at 734 (citing First Fed. Life Ins. Co. v. Martin (In re Martin), 698 F.2d 883, 886 (7th Cir.1983)).

> Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced a loss of assets or deficiency of assets; and (2) that the debtors cannot provide a satisfactory explanation for such loss. *See* Lawrence P. King,

6 Collier on Bankruptcy ¶ 727.08 (15th ed. rev.2002).

There are two stages of proof with respect to this section. The plaintiff has the initial burden of producing some evidence that the debtor no longer has assets which he previously owned. *See* Ehle v. Brien (In re Brien), 208 B.R. 255, 258 (1st Cir. BAP 1997). Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory explanation for the loss or deficiency of the asset. Krohn v. Cromer (In re Cromer), 214 B.R. 86, 95 (Bankr. E.D.N.Y. 1997).

In re Aoki, 323 B.R. at 817.  The panel added:

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *See* Baum v. Earl Millikin, Inc., 359 F.2d 811, 814 (7th Cir.1966). In determining whether to grant a discharge under § 727(a)(5), a court is interested in what happened to a debtor's assets and not in the wisdom of the debtor's disposition of the assets. *See* id. Moreover, unlike § 727(a)(2)(A), there is no requirement under § 727(a)(5) that a debtor act fraudulently or intentionally. *See* Cromer, 214 B.R. at 95.

A debtor's explanation need not be comprehensive, but it must meet two criteria:  First, it must be supported by at least some corroboration. *See, e.g.,* Wortman v. Ridley (In re Ridley), 115 B.R. 731, 737 (Bankr. D. Mass. 1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616 (11th Cir. 1984); First Tex. Sav. Ass'n v. Reed (In re Reed), 700 F.2d 986 (5th Cir. 1983)). Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. Id. A debtor's explanation must consist of more than "a vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions." Id. (citations omitted). "A jumble of vague, unassorted memoranda, checks, bank statements, and bills" is insufficient. Id. at 738 (citing Jackson v. Menick, 271 F.2d 806, 809 (9th Cir. 1959)). Therefore, discharge will be denied when a debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation. Id. at 737–38 (citations omitted).

In re Aoki, 323 B.R. at 817-18.

6. Analysis

The Court finds that the Debtor failed to satisfactorily explain his loss of assets, namely the proceeds of loans from Giannelli and Viglas, as well as the proceeds from the sale of Buffalo Bills Beef & Seafood LLC. The Debtor testified, broadly and vaguely, that he gave his spouse money to pay bills and that he paid bills with the monies as well. The Debtor's testimony, however, was not adequately corroborated because of his use of monies obtained over the counter and cash. *See, e.g.,* Wortman v. Ridley (In re Ridley), 115 B.R. 731, 737 (Bankr. D. Mass. 1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616 (11th Cir. 1984); First Tex. Sav. Ass'n v. Reed (In re Reed), 700 F.2d 986 (5th Cir. 1983)). Because the Debtor could have used at least some of the monies to invest in other business ventures, rather than paying bills such as his mortgage, his testimony did not eliminate speculation as to what happened to all of the assets. Id. The Debtor's testimony was confusing and superficial and his Schedule F, on which he was unable to set forth the amounts due various creditors, is indicative of his inability to document how much money he ostensibly paid creditors. Thus, his explanation was too vague to rebut the Trustee's evidence. "A jumble of vague, unassorted [sic] memoranda, checks, bank statements, and bills" is insufficient to establish a defense to a claim under § 727(a)(5). Wortman v. Ridley (In re Ridley), 115 B.R. at 738 (citations omitted).

## IV. CONCLUSION

In accordance with the foregoing, the Court shall enter judgment in favor of the Trustee and against the Debtor on all counts of the Trustee's Amended Complaint. The

Debtor's discharge is denied.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  October 7, 2014